## SUFFERN & GALLOWAY *vs.* BUTLER & BUTLER.

1. The omission to read an instrument to an illiterate marksman, renders the certificate of acknowledgment of no value as proof, where the dispute is whether the paper so certified is the paper that was actually read, or whether it was correctly read to the party executing it.

2. Ordinarily, the burthen of proof is upon a party impeaching his own deed, to show that it is not his deed after it is formally proved. But where it appears beyond doubt that the grantors are illiterate marksmen, and that the deed was read to them by the grantee himself, and by him only, the burthen of proof is shifted.

3. A court of equity will not lend its aid to enforce an unjust and unconscionable bargain, even if its due execution be clearly proved.

4. The assignee of a lease will not be aided in enforcing its performance where his assignor has failed, on his part, to perform the material part, and the assignee has notice of such failure.

Argued on pleadings and proofs.

*Mr. Ransom* and *Mr. Wortendyke,* for complainants.

*Mr. A. S. Pennington,* (with whom was *Mr. Van Blarcom,*) for defendants.

The bill is filed: 1st, to quiet the title of complainants, that is to establish their right, and is to some extent in the nature of a bill for specific performance. 2d, for injunction.

The defendants deny that *they ever made any such contract.*

The contract is of a character that courts will not aid if they can help it. It is on its face, a contract by which no money is to be paid to the defendants, only a royalty.

Defendants held two hundred and eighty acres of land, whose great value consisted in a mine or mines. If the mine should turn out to be a good one, the grantees, Wanmaker & Hussey, would make a great profit. If not, they would only lose the money to be laid out to demonstrate its value.

Wanmaker went to defendants to get from them a contract

by which he and Hussey could get their rights to the mine. He pretended they would build a furnace and a railroad up to the mine, and, no doubt, made great promises. But they intended to deceive defendants, who were ignorant men who could neither read nor write. Wanmaker pretended to be a great friend, and they placed implicit confidence in him. He proposed the matter to them. He then went to the mountain where they lived. He did not take any body with him who could see fair play—no one but his son. The matter was then so arranged that the defendants could be imposed upon, if Wanmaker wished to do so.

The Court of Chancery protects all persons who are liable to imposition, such as infants, married women, expectant heirs, seamen, drunkards, and ignorant persons, who could neither read nor write.

A man who cannot read is entirely at the mercy of a scheming person. In such a case, the Court of Chancery will scrutinize the contract, so as to see whether, from the face of the contract, it is such a contract as Wanmaker ought to have made with these ignorant men, or not. If it shall appear to be unjust or unconscionable, a Court of Chancery will not *aid the complainants*, but leave them to their action at law, if they have any.

What was the contract? According to Wanmaker's own evidence, it was a lease for forty years. But the contract here sought to be enforced is a perpetual grant or right to enter, prospect, and work the mine. We deny this part of the contract. It is not the contract agreed upon, as Wanmaker states.

The contract on the part of the grantees binds only the "heirs, executors, administrators, and assigns," but not the grantees. Could this have been a part of the contract to which the Butlers agreed? Could Wanmaker have informed the Butlers they were to have no money until they, Wanmaker & Hussey, were dead, *and would the Butlers have agreed to it?*

The covenant does not bind the grantees to work at the mine, or to open it at all—only to commence within forty years. Would the Butlers, if informed of this, have agreed to it, and could Wanmaker have conscientiously asked it? If this had been so, the mine would have been locked up, or in no way available to the Butlers for forty years, without any conceivable profit to them for all that time. Would it not have put them in the power of Wanmaker & Hussey for forty years? There would have been no royalty.

The contract is signed by the Butlers, but not by Wanmaker & Hussey. This shows that Wanmaker & Hussey did not intend to bind themselves to anything. They were not aware that they might be bound by such an agreement; but it shows the intent. Could we sue for royalty if they did not sign, especially if they should sell to a bankrupt?

The objection of not being signed by the purchaser, has been often overruled; but it may be taken as an ingredient to *add weight to other objections.* 3 *Swanst.* 435.

Is this contract such a one as the Court of Chancery ought to aid if there was no denial of its being the true contract?

We contend that this class of contracts is always suspicious. They are attempts to get great profits out of the ignorant or unwary. They are contracts such as are generally made under pretences of great friendship, and for the benefit of the party, but really to make money out of them.

What was the effect of this contract? It was to prevent the Butlers from ever selling their property without the consent of Wanmaker & Hussey; it was to put a perpetual lien on the property. Can any man believe that the Butlers would ever make such a bargain, *knowingly?* They might sign such a paper, *but never, if they knew the contents.* They could not sell the property. They could get nothing if the mine should be worked during the life of Wanmaker & Hussey, and they had no covenant binding them to work the mine. And did Butler understand the words "net profits?" Ignorant men do not.

Here, then, is an unconscionable contract, which is fraudulent on its face, and which the court is bound to notice.

Fraud may be apparent from the intrinsic nature and subject of the bargain itself, such as no man in his senses, and not under delusion, would make, on the one hand, and as no honest and fair man would accept, on the other, which are inequitable and unconscientious bargains, and of such, even the common law has taken notice. *Chesterfield* v. *Janssen*, 2 *Ves. sen.*, 155.

There is always fraud presumed or inferred from the circumstances and conditions of the parties contracting—*weakness on the one side*, usury on the other, or extortion, *or advantage taken of that weakness*. *Ibid.* 157.

The doctrine is settled, that in setting aside contracts on account of inadequate consideration, the ground is fraud arising from gross inequality. Unless the inadequacy does of itself, *ex evidentia rerum*, prove fraud, the rule is, that inadequacy of itself has not the weight suggested. If, indeed, advantage be taken, on either side, of the *ignorance* or distress of the other, it affords a new and distinct ground, and a very great inadequacy may form a presumption of oppression. *Osgood* v. *Franklin*, 2 *Johns. C. R.* 24.

Fraud *may be presumed* from the *circumstances* and *condition* of the parties contracting, and this *goes further* than the rule of *law*, which is, that it must be *proved*, not *presumed*. 1 *Story's Eq. Jur.*, § 188.

When there are other ingredients in the case, of a suspicious nature, or *peculiar relations* between the parties, gross inadequacy of price must necessarily furnish the *most vehement presumption of fraud*. The peculiar relation here is that of Wanmaker's being a pretended friend, and that he said he was working for the Butlers, and they were ignorant of business, and could not read or write.

It is not necessary for us to show absolute fraud; constructive fraud is enough, or even a mistake of Wanmaker.

It appears that Wanmaker says the lease was to be for forty years. The defendants and all the family then present

VOL. IV.                    s

understood the agreement to be a lease for two years, with a right for Wanmaker & Hussey to pay the $10,000 in two years, or give up the lease; or for the Butlers to accept the royalty at the end of two years, or not. That the family did not mean to give an absolute deed in fee, or a lease for forty years, is very clear; they all agree in this. Then I take this position: that if there is no fraud in the case, if there was a serious misunderstanding—honest it may be—the agreement cannot be enforced, as against anybody, especially against the parties who could not read or write.

It takes two to make a bargain. It is no bargain. If it was, then an ignorant man would always be at the mercy of a cunning, unscrupulous man. 1 *Story's Eq. Jur.*, § 770.

As to the agreement being in writing.

Where there is a *written contract*, all antecedent propositions, negotiations, and parol interlocutions on the same subject, are to be deemed merged in such contract. 1 *Story's Eq. Jur.*, § 160.

A memorandum in writing, to be valid, must contain the essential terms of the contract, expressed with such clearness and certainty that they may be understood from the writing itself, or some other paper to which it refers, without the necessity of resorting to parol proof. *Parkhurst* v. *Van Cortlandt*, 1 *Johns. C. R.* 274.

The uncertainty of the terms of the agreement is then, of itself, an insuperable objection to the specific execution sought by the bill.

The Butlers did not mean to make the contract as drawn. They were indignant when they heard what the paper contained. They said it was not the agreement they had made, and said, as people would say who were so imposed upon; that it was a forgery. Wanmaker, when they said so to him, did not say to them that that was the agreement they had made.

Then, if the contract made was not truly set out in the papers, it cannot be enforced, either at law or in equity.

Suffern & Galloway *v.* Butler.

THE CHANCELLOR.

The complainants claim the right to mine and take away iron ore from the lands of the defendants, in the county of Bergen. The defendants are in possession of the lands, deny the right of the complainants, and forbid and prevent them from entering and taking ore. The object of the bill is, to establish the right claimed by the complainants, and to restrain the defendants perpetually from interfering with, or obstructing its exercise.

The complainants found their claim on an instrument which they term a mining lease, and which they allege was made by the defendants on the 31st day of October, 1863, to J. S. Wanmaker and C. Hussey, who, on the 18th of March, 1866, assigned and conveyed all their rights, by virtue of said lease, to the complainants.

The defendants deny the execution of the lease, or instrument called a lease, under which complainants claim. They deny that they signed the paper set out and produced as the lease, and say, if they did make the marks in their names affixed to this paper, that the contents of the paper were fraudulently misread to them by Wanmaker, at its execution, they being illiterate and unable to read.

This question forms the main controversy in the case. This instrument called a "lease" in the pleadings and by a printed title on its back, and a "mining lease," by a printed caption on its face, is a perpetual grant in fee, of the right to enter and take the ore and minerals on the premises. Its operative words are, " grant and convey;" the consideration is $1, and the covenants therein ; the grant is to " the party of the second part, their heirs, executors, administrators, and assigns." The estate granted is the right to enter upon the lands described (a tract of two hundred and eighty-eight acres,) for the purpose of searching for mineral and fossil substances, and of conducting mining and quarrying operations to any extent they may deem advisable. The covenants are, to pay to the party of the first part ten per

cent. of the net profits of the minerals and ores, if any shall be found; and it has in it an express proviso, that if no mineral or fossil substance be mined or quarried within forty y ars from the date, then those presents should be void. Tais instrument, drawn by filling a printed blank, is signed with the names of the defendants, in which marks are made, and to which seals are affixed over written scrolls, and the sealing and delivery represented as attested by Gloravina L. Butler, a sister of the defendants, and by Edward L. Wanmaker, a son of J. S. Wanmaker, one of the grantees. It is all on the first page of the sheet, and all the written part, except the two crosses for marks and the names of the subscribing witnesses, are in the handwriting of J. S. Wanmaker.

On the third page of this document is an agreement of the same date, between the defendants, of the first part, and Wanmaker & Hussey, of the second part, by which it is agreed that the party of the second part shall pay to the party of the first part, in two years from the date, $10,000, in lieu of the " ten per cent. agreed upon in said lease;" and that then the party of the first part shall convey to them, their heirs and assigns, the lands described in the lease. This agreement, wholly in writing, is, on its face, executed by the defendants by their marks and seals, the seals put on over written scrolls, and by Wanmaker & Hussey, under their hands and seals. The names of the two subscribing witnesses, being the same as to the grant, are signed at the foot, on the left hand side, opposite the names of the defendants, but without any attestation clause; and to a special clause of attestation—" witness, as to Wanmaker and Hussey "—written under the names of these witnesses, is subscribed the name of Garret H. Van Horn. On the fourth page, or back of the instrument, is endorsed a certificate of acknowledgment, dated November 14th, 1863, and signed by Garret H. Van Horn, who was a commissioner of deeds for Bergen county; it certifies that he made known to the defendants the contents of the within indenture of lease,

and that they acknowledged the execution of it.   If the acknowledgments were of any value, it might be a question to which of the two writings it would apply, as both begin with the words " this indenture," and neither is a lease.   But Van Horn and the other witnesses testify that he never read to the defendants either of these papers, or made them acquainted with the contents, and that he omitted to do so upon the suggestion of Wanmaker that he had read the paper to them, to which they assented by a nod.   The omission of this positive requisition of the statute, especially in the case of illiterate marksmen, renders the certificate of no value as proof in this case, where the whole dispute is whether this is the paper read, or whether it was correctly read to the defendants.

The signature of Van Horn to the acknowledgment and the attestation enables him to identify the paper; and his testimony that the defendants put their fingers on the seals, and acknowledged them as their seals, relieves the instrument from a difficulty raised by the evidence and the written scrolls under the seals, making it probable that there were no seals to it at its execution—a fact that would make it void as a grant.

From the confused and obscure language of the last paper, a doubt might well arise whether there was not a mistake in drawing it, by omitting the word "if" before the agreement *that* " the party of the second part shall pay," so as to make it an unilateral contract that the defendants should convey *if* Wanmaker & Hussey paid, leaving to them the option of paying.   But the fact that Wanmaker & Hussey signed this contract fourteen days after its execution by the other parties, and that Hussey, who was not present at the execution by the Butlers, was then present, as if for that purpose, clearly outweighs all inferences to be drawn from the want of order in the structure of a contract, which contains a positive agreement to pay.   And it may be inferred that the instrument was not completed or delivered, and was not

s *

intended to be so considered, until it was executed by Wanmaker & Hussey.

At the alleged signing of these two documents by the defendants, besides the defendants and J. S. Wanmaker, there was present Edward S. Wanmaker, the son of James S. Wanmaker, and Jeremiah, James, and Thomas, the three brothers of the defendants, and Gloravinia Butler, their sister, all of whom have been sworn as witnesses; also their mother, Polly Butler, who has not been sworn. James S. Wanmaker and his son, Edward, testify that Edward was present at the reading of the papers. The six Butlers all testify that Edward was not present, but had stepped out of the room to see to his horse, which had become restive, and that he was called in after the reading to witness the execution. The two Wanmakers testify that the paper called the lease was executed before the agreement for sale was agreed upon or drawn. The six Butlers testify that the whole matter was agreed upon and put in writing before anything was executed by them, and that the paper executed by them was one agreement, and was signed by each of them at one time, and but once. The two Wanmakers swear that the papers were correctly read as they are now produced. The six Butlers testify that the paper read to them did not contain any term of forty years, that its purport was to lease the rights for ten per cent.; and it provided that if, at the end of two years, they were dissatisfied with the ten per cent., Wanmaker & Hussey must pay $10,000 for the land, or give up the lease. Gloravinia Butler testifies that her signatures as subscribing witness to both these instruments are not in her handwriting, but are good counterfeits or imitations of it, and that she never writes her name Gloravina, as there written, but Gloravinia. In this she is sustained by a number of documents offered in evidence by both sides, signed by her. As her handwriting is not that of an illiterate person, it is difficult to conceive that she can be mistaken in this. She may swear falsely, but this assumption would seem to involve a plan premeditated at the execu-

tion. Other papers signed by her on that day have her name spelled correctly.

It is possible that the sister and five brothers may have conspired to commit perjury, to aid the defendants in this suit. The amount involved is, or may appear to them, to be great. But, on the other hand, Wanmaker and his son may have combined to screen him from a charge that involves forgery, or a charge in moral turpitude as base as forgery— the false reading of papers to be signed by ignorant persons, who had confidence in his integrity. It would present great temptation to him, and almost as great to his son.

The Butlers are said to be ignorant, and the evidence shows that they are both ignorant and weak in intellect, and the consciousness of this would perhaps make them more inclined to combine together for mutual protection against persons of more knowledge and sagacity, whom they might suspect of taking advantage of their ignorance. And, in this case, they had been informed that Wanmaker had boasted that he could do what he pleased with them, on account of their ignorance. For the purpose now under consideration, it is of no consequence whether the report which came to them was true or false. On the other hand, Wanmaker, although his character, or even reputation, may not be affected by any evidence in the case, presents himself in the light of a mere speculator in the property of others; he was using his character for intelligence and fairness among his more ignorant neighbors, to obtain contracts for, or grants of rights in their lands from them, to sell to adventurers for profit, without any design of working the mines, or using the rights obtained, himself. By the confidence reposed in him, he obtained grants which the strangers to whom he sold them could not have obtained, and with less vigilance as to the terms and purport of the papers, than would have been exhibited towards strangers—a strong inducement, both to him and his son, to say, and perhaps to believe, that he had not done anything in breach of that confidence.

In this situation, it is very difficult to determine to which

set of witnesses to give credit. The weight of testimony, so far as the number of witnesses is concerned, is on the part of the defendants. And these six witnesses have nothing brought against them to impeach their character for integrity, except the considerations which I have above stated, which are at least not more weighty than those against the two witnesses of the complainants. Ordinarily, the burthen of proof is upon a party impeaching his own deed, or what purports to be such, to show that it is not his deed, after it is formally proved. But here it appears beyond doubt, that the defendants are illiterate marksmen; that the deed was read to them by the grantee himself, and by him only. This proof shifts the burthen the other way. The reading of a deed to or by the grantor, which is one of the requisites of a good deed, will be presumed where he can read; but where it appears that he cannot read, it must be proved.

Yet, I am not willing to believe that the names of the defendants were forged to this deed, or that it was wilfully and fraudulently misread to them, or that Wanmaker and his son have deliberately perjured themselves, though I cannot help believing that they, as well as the Butlers, are, in many things, mistaken.

The conclusion cannot be avoided, that the defendants executed these papers under the impression produced by Wanmaker, that it was a lease of the minerals or mining rights in their lands, with full license to dig and explore, at a rent or seigniorage of ten per cent. of the profits, with the privilege, at the end of two years, of demanding $10,000 for the fee, and, if that was not paid, to put an end to the lease. I am satisfied that the whole paper, or both parts, were written before either part was signed, and that they were read as one instrument and executed as such, with that understanding of their contents. And if their understanding of the contents was materially wrong, which I shall consider presently, it does not much matter, for the purpose of this suit, whether it was produced by misreading, or by the explanation of the contents and effect by Wanmaker.

The paper called the lease, if it is sufficient to convey any valuable rights, is, on its face, so one-sided and inequitable, that it is hardly possible to conceive that any person, however ignorant of business or conveyancing, if of full age, and in any degree removed from idiocy, would execute it, if he fully understood its contents.

It grants forever the mining right to all ores in the lands; a proviso is added, it is true, to terminate this right at the end of forty years, if no mineral or fossil substances be mined within that time; but raising a ton of iron ore of any quality, however worthless, or if the term "fossil" is to have any significance, digging up the skeleton of an old horse, or the trunk of an old tree, deeply buried, gives the estate forever. Some tons of ore have been dug here, and this grant, if worth anything, is now perpetual. It is an encumbrance upon the property, which encumbrance it seems is valued at several thousand dollars, that was placed there without any consideration paid, and without any necessary expenditure of a single dollar, to make it endure for forty years, and which the expenditure of $100 could have made perpetual. If iron ore or other minerals of any value should exist there, the defendants could not advantageously dispose of it, unless they first extinguished this encumbrance, at whatever price might be demanded. The seigniorage of one tenth of the net profits, if the grantees or their assigns should choose to work the mines, is absurdly small, and could be made so little or so obscured by the charges for carrying on the work, as to become invisible to the defendants or to the courts. For these reasons, added to the testimony of the six witnesses, I do not believe that the defendants executed, or agreed to execute, that indenture by itself, understanding its contents. If the fact of execution and reading were clear or admitted, the bargain is so outrageously unjust and unconscionable that a court of equity would hardly aid in its execution by its extraordinary powers of injunction or specific performance, but would leave the grantees to their remedy at law.

The paper itself is a strange one, not known to, or devised by any conveyancer familiar with the common law. It is named a lease, but is clearly a grant in fee; it, by its words, grants only the right of entering for the purpose of searching for minerals and conducting mining operations; it has no words proper to grant the minerals or the right to take the ore away, though perhaps this might be inferred from the words inserted by Wanmaker in the covenant, to pay ten per cent. of the net profits on the minerals or ores, if any should be found. It is but justice to Wanmaker to say that it clearly appears that he did not understand the effect and purport of this paper; he supposed it to be only a lease for forty years.

If the defendants understood these papers as one instrument, and executed both at the same time, it is easy to conceive that they would not have that understanding dissipated by being told to sign in two places, and that they would now recollect it as only one execution and signature.

Taken together as one instrument, this conveyance and bargain would not be an equitable one, nor, according to its legal effect, much different from the understanding which the defendants had of it at its execution. And if these papers were read and executed together, as above stated, as one contract, they must be taken and construed together as parts of one contract, and they are one contract.

The effect is, to grant the right to enter and search for ores and minerals, and to mine the same forever, unless none are found in forty years. The grantees are bound, if they mine and sell ore, to pay the grantors one tenth of the net profits; but at the end of two years the grantees are bound to pay them $10,000, in lieu of the ten per cent., and thereupon the grantors are bound to convey the fee. The paper does not expressly leave the payment, or the continuance of the ten per cent., at the option of the Butlers, as they understood, but the grantees are bound to pay the $10,000, at any rate, and have not the option of giving up the grant, instead of making the payment. But the effect of it would be

to place the property as the Butlers wished it, that they could, if they chose, at the end of two years, sell the property for $10,000, or have the land freed from the burthen of the grant. Wanmaker may have stated the effect of the grant to them wrongly, through his own misapprehension, or because he did not wish to leave the Butlers under the impression that they could compel the purchase.

Upon this view of these instruments, that they must be taken together as one, and that the grantees were bound, at the end of two years, to pay $10,000, in lieu of the ten per cent., and take a conveyance of the property, and with the proof which is in the case, that the defendants, at the end of the two years, asked for the payment of that sum, it is clear, that the complainants claiming under Wanmaker & Hussey are not entitled to the aid of this court in enforcing by injunction, or in any other way, the enjoyment of an easement, or the performance of a contract, when the material part—the payment of the whole real consideration—has not been performed on their part.

The claim of these complainants as *bona fide* purchasers without notice can be of no avail here, in any aspect of the case. If the instruments are affected by forgery or fraud in the reading, they have the same equity as the innocent holder of a forged note or mortgage would have. If the two papers are to be construed as one instrument, and in the manner above indicated, the complainants claiming through these documents written on one sheet and recorded together, had notice of their contents, and of the facts that make them one instrument.

It is not necessary for me to determine in this case whether the complainants, as assignees of the grant, or purchasers of the estate granted, are liable to the covenant to pay the $10,000; the assignees of a lease would be clearly liable on a covenant to pay rent, or to any matter that concerned or related to the land devised. On the pleadings in this suit, no relief can be given to the defendants against them. The only adjudication that can be made is to deny

the relief sought by the complainants.  I am of opinion, that the relief·prayed for must be refused, and the bill dismissed, with costs.